UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X
                                   :

ERIC TAYLOR and KRISTINE EKMAN,      :      13-CV-1013
                                   :

                Plaintiffs,       :      <u>NOT FOR ELECTRONIC</u>
                                   :      <u>OR PRINT PUBLICATION</u>

      -against-                 :
                                   :      <u>MEMORANDUM AND</u>
BEN BERNANKE, in his official capacity as Chairman of  :      <u>ORDER</u>
the Board of Governors of the Federal Reserve System;  :
MARTIN J. GRUENBERG, in his official capacity as     :
Chairman of the Federal Deposit Insurance Corporation;  :
MARY JO WHITE, in her official capacity as Chairperson :
of the U.S. Securities and Exchange Commission; GARY  :
GENSLER, in his official capacity as Chairman of the U.S. :
Commodity Futures Trading Commission; THOMAS J.    :
CURRY, in his official capacity as Comptroller of the    :
Currency, U.S. Department of the Treasury; MARY J.     :
MILLER, in her capacity as Under Secretary for Domestic :
Finance, U.S. Department of the Treasury; JACOB LEW,  :
in his official capacity as Secretary of the Treasury at the  :
U.S. Department of the Treasury,                 :
                                   :
                Defendants.     :
                                   :
-------------------------------------------------------------------- X

ROSS, United States District Judge:

       Plaintiffs, in their capacities as individual bank depositors and members of Occupy the

SEC ("OSEC"), challenge the delay by defendants, as officers or employees of federal agencies,

in issuing a joint final rulemaking under 12 U.S.C. § 1851 (known as the "Volcker Rule").

Plaintiffs seek a judgment from this court compelling the defendants to issue such a joint final

rulemaking. While the delay in the final rulemaking may be a source of great frustration for

plaintiffs, they have failed to establish any injury in fact traceable to that delay that would confer

standing to bring this case in federal court. Therefore, for reasons more fully explained below,

1

the court finds that the action presents no genuine case or controversy and grants defendants'
motion to dismiss for lack of subject matter jurisdiction.

## BACKGROUND

I.     ***The Dodd-Frank Act and the Statutory Framework for the "Volcker Rule"***

In the wake of the 2008 financial crisis, Congress passed the Dodd-Frank Wall Street
Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act"). According to the
Financial Services Oversight Committee ("FSOC"), the Dodd-Frank Act was "intended to
strengthen the financial system and constrain risk taking at banking entities." FSOC, Study &
Recommendations on Prohibition of Proprietary Trading & Certain Relationships With Hedge
Funds & Private Equity Funds 1 (Jan. 2011),
http://www.treasury.gov/initiatives/documents/volcker%20sec%20%20619%20study%20final%
201%2018%2011%20rg.pdf (last viewed on Aug. 28, 2013) ("FSOC Study").

Section 619 of Dodd-Frank Act amended the Bank Holding Company Act of 1956, 12
U.S.C. § 1841 et seq. ("BHC Act"). The provisions added to the BHC Act at 12 U.S.C. § 1851
(the "Volcker Rule") address "prohibitions on proprietary trading and certain relationships with
hedge funds and private equity funds." 12 U.S.C. § 1851. The Volcker Rule restricts the ability
of "banking entities" to engage in "proprietary trading" or to hold interests in hedge funds or
private equity funds, 12 U.S.C. § 1851(a)(1), and it imposes additional requirements and
oversight on "nonbank financial companies" that engage in such activities, id. § 1851(a)(2). The
Volcker Rule defines "proprietary trading" as "engaging as a principal for the trading account of
the banking entity or nonbank financial company . . . in any transaction to purchase or sell, or
otherwise acquire or dispose of, any security, any derivative, any contract of sale of a commodity

for future delivery, any option on any such security, derivative, or contract, or any other security or financial instrument that the appropriate Federal banking agencies, the Securities and Exchange Commission, and the Commodity Futures Trading Commission may . . . determine." Id. § 1851(h)(4).

Notwithstanding the restrictions on proprietary trading under the statute, the Volcker Rule permits banks and nonbank financial companies to engage in certain enumerated "permitted activities," including certain activities related to underwriting, risk-mitigating hedging, insurance, and transactions on behalf of customers. Id. § 1851(d)(1). However, such permitted activities are subject to other provisions of state and federal law, certain limitations listed under the statute, and "any restrictions or limitations that the appropriate Federal banking agencies, the Securities and Exchange Commission, and the Commodity Futures Trading Commission, may determine." Id. § 1851(d)(1)-(3).

The statute requires that "not later than 6 months after July 21, 2010, FSOC must issue a study with recommendations as to how the provisions of the Volcker Rule should be implemented to take into account enumerated objectives, including to "promote and enhance the safety and soundness of banking entities" and to "protect taxpayers and consumers and enhance financial stability by minimizing the risk that insured depository institutions and the affiliates of insured depository institutions will engage in unsafe and unsound activities." Id. § 1851(b)(1). The statute also states: "Unless otherwise provided in this section, not later than 9 months after the completion of the study [by FSOC], the appropriate Federal banking agencies, the Securities and Exchange Commission, and the Commodity Futures Trading Commission, shall consider the findings of the study . . . and adopt rules to carry out this section." Id. § 1851(b)(2)(A). The

Chairperson of FSOC has responsibility for coordination of the implementing regulations.  Id. §

1851(b)(2)(B)(iii).

Under the statute, the provisions of the Volcker Rule take effect on the earlier of (A)

twelve months after the date the final implementing rules are issued or (B) July 21, 2012.  Id. §

1851(c)(1).  However, the statute creates a two-year conformance period that begins on the date

the regulations go into effect and allows banks and nonbank financial companies an additional

period of time during which they must bring their activities into compliance with the Volcker

Rule (the "Conformance Period").  Id. § 1851(c)(2).  The Board of Governors of the Federal

Reserve System (the "Board") has the discretionary authority to extend the Conformance Period

for up to one year at a time for a maximum of three years in the aggregate.  Id.

## II.    *Rulemaking Under the Volcker Rule*

On July 18, 2011, FSOC issued its study and recommendations pursuant to 12 U.S.C. §

1851(b)(1).  See FSOC Study; Defendants' Local Rule 56.1 Statement, Dkt. #23 ("Defs. Facts")

¶ 7.  By October 12, 2011, the Board, the Office of the Comptroller of the Currency ("OCC"),

the Federal Deposit Insurance Corporation ("FDIC") and the U.S. Securities and Exchange

Commission ("SEC") created a "lengthy and detailed joint notice of proposed rulemaking for the

Volcker Rule regulations" (the "Proposed Rulemaking").  Defs. Facts. ¶ 8.  The lengthy notice,

which jointly requested comments on 383 separate issues, was published in the Federal Register

on November 7, 2011.  See Prohibitions and Restrictions on Proprietary Trading and Certain

Interests in, and Relationships With, Hedge Funds and Private Equity Funds, 76 Fed. Reg. 68846

(Nov. 7, 2011); Defs. Facts ¶¶ 8-9.  The SEC requested comments on eleven additional issues.

See 76 Fed. Reg. at 68940-68944; Defs. Facts ¶ 10.  The notice invited public comment on the

proposed rulemaking through January 13, 2012 (see 76 Fed. Reg. at 68846; Defs. Facts ¶11), and the agencies issuing the notice subsequently extended the comment period, upon public request, until February 12, 2012.  See 77 Fed. Reg. 23, 23-24 (Jan. 3, 2012); Defs. Facts ¶11.

On February 14, 2012, the U.S. Commodities Futures Trading Commission ("CFTC") issued its own notice of proposed rulemaking substantially identical to the Proposed Rulemaking issued by the other agencies and including the entire text of the Proposed Rulemaking.  See 77 Fed. Reg. 8332 (Feb. 14, 2012); Defs. Facts ¶¶ 12-13.  The CFTC requested comment on the same 383 questions from the Proposed Rulemaking as well as an additional fourteen questions unique to CFTC.  See 77 Fed. Reg. 8332; Defs. Facts. ¶ 14.

Since the notice was issued, the agencies have received over 18,000 public comments on the Proposed Rulemaking, including a 325-page comment letter submitted by OSEC, a subgroup of the Occupy Wall Street movement, requesting quick implementation of the Volcker Rule.  See Am. Compl., Dkt. #12, ¶¶ 5, 21, 30 (citing OccupytheSEC's Comment Letter re Prohibitions and Restrictions on Proprietary Trading — File S7-41-11 at Ann. A-2 (Feb. 13, 2012), available at http://www.sec.gov/comments/s7-41-11/s74111-230.pdf); Defs. Facts ¶ 15.  Hundreds of those comments were unique and non-duplicative, and a number of them were over 100 pages long. Defs. Facts ¶ 16.  Since the close of the formal comment periods, the public has continued to submit, and the agencies have continued to accept, comments on the proposed regulations.  Id. ¶ 20.  Although the agencies continue to meet with concerned individuals and groups in furtherance of finalizing the regulations, Defs. Facts ¶ 21, the regulations have not been finalized to date, Am. Compl. ¶ 16.

**III.**     ***The Conformance Period***

Pursuant to 12 U.S.C. § 1851(c)(1), in the absence of finalized implementing regulations, the provisions of the Volcker Rule took effect on July 21, 2012.  See Statement of Policy Regarding the Conformance Period for Entities Engaged in Proprietary Trading, 77 Fed. Reg. 33949, 33949 (June 8, 2012); Defs. Facts ¶ 24.  Currently, under the Conformance Period, entities subject to the Volcker Rule have until July 21, 2014, to come into compliance with the rule's provisions.  See 12 U.S.C. § 1851(c)(2); 77 Fed. Reg. at 33950; Defs. Facts ¶ 25.  At its discretion, the Board may extend the conformance period for one-year intervals through July 21, 2017, if the extension is "consistent with the purposes of [the Volcker Rule] and would not be detrimental to the public interest."  See 12 U.S.C. § 1851(c)(2); accord Defs. Facts ¶ 26.

## IV.    *The Plaintiffs' Lawsuit*

Plaintiffs filed this action on February 26, 2013, Dkt. #1, and subsequently filed an amended complaint, Dkt. #12, on May 23, 2013.  The amended complaint alleged that plaintiffs Eric Taylor and Kristine Ekman had deposits in checking counts held by JP Morgan Chase Bank, N.A., and Wells Fargo Bank, N.A., respectively ("Plaintiffs' Banks"), both of which are national banks and U.S. insured depository institutions.  Am. Compl. ¶¶ 5, 6.  The complaint further alleged that plaintiffs were members of OSEC, which the complaint described as "a subgroup of the Occupy Wall Street movement and an unincorporated association that advocates for regulatory reforms in the banking and financial system."  Id.; see also Defs. Facts ¶¶ 5-6.

According to plaintiffs, at the "time of the global financial crisis of 2008, deposit-taking banks were actively engaged in 'proprietary' (speculative) trading activities that put bank deposits at risk and proliferated that risk across the country."  Am. Comp. ¶ 14.  Plaintiffs stated

in their amended complaint that the purpose of Volcker Rule was "to re-orient deposit-taking banks toward safe, traditional banking activities (like offering checking accounts and making loans to individuals and businesses), and away from the kind of speculation that has imperiled deposited funds as well as the global economy at large." Id. ¶ 15. Plaintiffs alleged that, while "some banks have pared down their proprietary trading activities in anticipation of a fully implemented Volcker Rule," proprietary trading activities nevertheless persist among banks. Id. ¶ 16. Plaintiffs alleged that such continued activities put money held by bank depositors in national banks, including plaintiffs' deposits at Plaintiffs' Banks, at risk. Id. Plaintiffs alleged that, the longer the delay in finalizing regulations under the Volcker Rule, the greater the risk posted to their deposits. Id. Specifically, plaintiffs alleged that the delay in finalizing the rule past the statutory deadline placed plaintiffs' deposits at increased risk because "banks can continue to speculate with [plaintiffs' money] as long as the Volcker Rule has not been implemented." Id. ¶ 18.

Additionally, plaintiffs alleged that the delay in finalizing the regulations, and the consequent lack of a set of fully deleveoped rules for banks to adopt, prevents banks from being able to comply with the Volcker Rule in "good-faith." Id. ¶ 23. As a result, plaintiffs' advocacy activities as members of OSEC are frustrated because they are "unable to monitor banks' compliance with the Volcker Rule, advocate for improvements to such compliance, object to instances of non-compliance, and advocate for revisions [to] the Volcker Rule in view of real-world implementation." Id.

Plaintiffs brought this suit seeking declaratory, injunctive and mandamus relief pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and the Mandamus Act, 28

U.S.C. § 1361. First, they claim that the agencies have violated a "plainly defined and nondiscretionary duty" to plaintiffs, as depositors and members of OSEC, "to issue final regulations for the Volcker Rule" by the deadline mandated in the statute. Id. ¶¶ 26. Second, plaintiffs claim that defendants' failure to finalize regulations by the statutory deadline constitutes agency action "unlawfully withheld" or "unreasonably delayed" within the meaning of the APA. Id. ¶¶ 32. Because of the alleged injuries to plaintiffs caused by these two violations (i.e., the risk to their bank deposits and the frustration of their advocacy efforts), plaintiffs have asked this court (a) to declare that the delay in finalizing the implementing rules for the Volcker Rule violates the Dodd-Frank Act and (b) to grant a permanent injunction and/or order of mandamus compelling defendants, in their capacities as officers and employees of the Board, the FDIC, the SEC, the CFTC, and the Treasury (the "Agencies"), and those acting under them, to issue a final rulemaking for the Volcker Rule within a time frame established by the court. See id. at ¶ 9.

On July 12, 2013, defendants filed a motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) or, in the alternative, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Dkt. #21. First, defendants argued that this court lacks jurisdiction over the Board because the BHC Act, 12 U.S.C. § 1848, vests exclusive jurisdiction over any "order" of the Board in the United States Courts of Appeals. Mem. of Law in Supp. of Defs.' Mot. to Dismiss Pls.' Am. Compl. or, in Alternative, Mot. for Summ. J. 10-12, Dkt. #22 ("Defs. Mot."). Second, defendants argued that the claims against all defendants should be dismissed because plaintiffs lack standing. Id. at 12-20. Third, defendants argued that plaintiff's amended complaint should be dismissed because the claims were unripe for adjudication. Id. at 20-23.

Fourth, defendants argued that plaintiffs' suit should be dismissed for failure to state a claim or, in the alternative, defendants should be awarded summary judgment. <u>Id.</u> at 23-33.

In opposition to defendants' motion, plaintiffs argued that this Court does have jurisdiction over the claims against the Board because the statutory grant of jurisdiction to the Courts of Appeals does not apply in the absence of an order or other affirmative action by the Board. Pls.' Mem. in Opp'n to Defs,' Mot. to Dismiss or, in Alternative, Mot. for Summ. J. 3-9, Dkt. #30 ("Pls. Opp'n"). Plaintiffs further argued that they have standing to sue both in their capacities as bank depositors and activist members of OSEC who have suffered the injuries described above, <u>id.</u> at 1, 9-23, and that their claim is ripe because it "alleges delayed or omitted agency action" in violation of a statutory mandate, <u>id.</u> at 24-25. Plaintiffs also argued that they are entitled to relief on the merits. <u>Id.</u> at 25-31. In their reply, defendants reiterated their arguments that this court lacks subject matter jurisdiction over plaintiffs' claims and that plaintiffs are not entitled to relief on the merits. Reply Mem. of Law in Further Supp. of Defs.' Mot. to Dismiss Pls.' Am. Compl. or, in Alternative, Mot. for Summ. J., Dkt. #24 ("Defs. Reply").

Plaintiffs have also cross-moved for summary judgment, Dkt. #29, arguing that they are entitled to relief on the basis of the "totality of the undisputed facts." Mem. in Supp. of Pls.' Cross-Mot. for Summ. J. 2 ("Pls. Cross-Mot.").

The court now resolves all outstanding motions.

## DISCUSSION

Defendants moved, *inter alia*, to dismiss plaintiffs' case in its entirety under Rule 12(b)(1) for lack of subject matter jurisdiction on the grounds that plaintiffs do not have standing

to bring suit.  This court holds that plaintiffs lack standing in the instant action and, therefore, does not reach defendants' other arguments that this court lacks jurisdiction over the Board under the BHC Act or that plaintiffs have failed to state a claim pursuant to Rule 12(b)(6).  The court also need not consider defendants' arguments in the alternative for summary judgment or plaintiffs' cross-motion for summary judgment.

## I.      *Legal Standard Under Rule 12(b)(1)*

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  Makarova v. U.S., 201 F.3d 110, 113 (2d Cir. 2000); accord Fed. R. Civ. P. 12(b)(1).  The plaintiff bringing the action bears the "burden of proving by a preponderance of the evidence that [subject matter jurisdiction] exists."  Makarova, 201 F.3d at 113 (citation omitted); accord Clapper v. Amnesty Int'l USA, 133 S. Ct. 1138, 1148 (2013) .  In ruling on a motion to dismiss, the court must accept as true all material factual allegations in the plaintiff's complaint but need not draw inferences favorable to the party asserting jurisdiction.  Shipping Fin. Servs. Cor. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998) ("[W]hen the question to be considered is one involving jurisdiction of a federal court, jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."); see also  J.S. ex rel. N.S. v. Attica Cent. Schs., 386 F.3d 107, 110 (2d Cir. 2004).  "In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings."  Makarova, 201 F.3d at 113; J.S. ex rel. N.S., 386 F.3d at 110; Robinson v. Gov't of Malaysia, 269 F.3d 133, 140-41 & n.6 (2d Cir. 2001).  However, the court not "may not rely on conclusory or hearsay statements contained in the affidavits."  J.S. ex rel. N.S., 386

F.3d at 110.

**II.**     *Standing*

    a.    <u>Legal principles</u>

The Supreme Court has established a two-part framework for standing analysis, which involves both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise. <u>See, e.g.</u>, <u>Warth v. Seldin</u>, 422 U.S. 490, 498 (1975); 15 James Wm. Moore et al., Moore's Federal Practice § 101.22 (3d ed. 2005). "In both dimensions [the standing inquiry] is founded in concern about the proper—and properly limited—role of the courts in a democratic society." <u>Warth</u>, 422 U.S. at 498. "[T]he irreducible constitutional minimum of standing derives from Article III, Section 2 of the U.S. Constitution, which limits federal judicial power to 'cases' and 'controversies.'" <u>Natural Res. Def. Council, Inc. U.S. Food & Drug Admin.</u>, 710 F.3d 71, 79 (2d Cir. 2013) (alteration in original) (internal quotation marks omitted). "To establish that a case or controversy exists so as to confer standing under Article III, a plaintiff must satisfy three elements: (a) the plaintiff must suffer an 'injury in fact,' (b) that injury must be 'fairly traceable' to the challenged action, and (c) the injury must be likely to be 'redressed by a favorable decision' of the federal court." <u>Id.</u> (quoting <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992)).

An "injury in fact" means "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." <u>Lujan</u>, 504 U.S. at 560 (internal citations and quotation marks omitted); <u>Natural Res. Def. Council</u>, 710 F.3d at 80. With respect to an alleged future injury, the Supreme Court recently explained that "imminence" requires that the future injury be "<u>certainly impending</u>," and that "[a]llegations of

possible future injury are not sufficient."  <u>Clapper</u>, 133 S. Ct. at 1147 (alteration in original)

(internal quotation marks omitted).  Standing will not be found where the occurrence of the

alleged future injury depends on a "highly attenuated chain of possibilities."  <u>Id.</u> at 1148.  While

the Supreme Court has recognized that "[i]n some instances" it has "found standing based on a

'substantial risk' that the harm will occur, which may prompt plaintiffs to reasonably incur costs

to mitigate or avoid that harm," it has explained that, even "to the extent the 'substantial risk'

standard is relevant and is distinct from the 'clearly impending requirement,'" injury in fact will

not be found where it requires a court to speculate about "an attenuated chain of inferences."  <u>Id.</u>

at 1150 n.5.  Where the occurrence of the future injury depends on the actions of a third party not

included in the plaintiff's suit, the Supreme Court has shown particular reluctance to conclude

that the "imminence" requirement is met.  <u>Id.</u> at 1150 ("We decline to abandon our usual

reluctance to endorse standing theories that rest on speculation about the decisions of

independent actors.").

　　　　Where a plaintiff has established injury in fact, such injury must be "fairly traceable" to

the conduct of the defendant alleged in the complaint; it cannot be "th[e] result [of] the

independent action of some third party not before the court."  <u>Lujan</u>, 504 U.S. at 560 (alteration

in original) (internal quotation marks omitted).  Standing is not necessarily precluded where the

alleged injury may have resulted indirectly from governmental action or inaction, but the

indirectness of the injury "may make it substantially more difficult to meet the minimum

requirement of Art. III:  to establish that, in fact, the asserted injury was the consequence of the

defendants' actions, or that prospective relief will remove that harm."  <u>Warth</u>, 422 U.S. at 505.

　　　　b.　　　<u>Plaintiffs fail to establish standing as depositors in national banks</u>

Plaintiffs first argue that they have standing "as depositors whose holdings are susceptible to bank dissipation due to the Agencies' failure to implement the Vocker Rule." Pls. Opp'n 9. However, plaintiffs fail to establish that their risk of loss is "imminent" or that any such risk inevitably results from the lack of a final rulemaking rather than the independent actions of banks prior to the expiration of the conformance period.

## I. *Injury in Fact*

Plaintiffs do not allege that they have actually lost any of their deposited funds, and plaintiff Eric Taylor readily concedes that he has not lost any of his money. See Taylor Decl. ¶ 8; see also Am. Comp. ¶ 20; Defs. Reply 4. Instead, they claim that they are injured by the increasing risk of loss of their bank deposits.[1] See Am. Compl. ¶ 16; Pls. Opp'n 12-17. According to plaintiffs' theory, in the absence of a final rulemaking with which banks can make a good faith effort to conform their behavior before the end of the Conformance Period, banks continue to engage in proprietary trading activities that put their depositors' money, including plaintiffs' dollars, at risk. Am. Compl. ¶ 16; Pls. Opp'n 12-13, 16-17. Particularly in light of the

---

[1]Relying on allegations in the declaration of plaintiff Eric Taylor, plaintiffs attempt to argue that they not only face an imminent risk of loss but that they have already suffered "actual" injury in that the "risk-adjusted value" of their deposits is decreasing daily as the conformance period comes closer to expiration without implementing regulations. See Pls. Opp'n 13 (citing Suppl. Decl. of Eric Taylor in Opp'n to Defs.' Mot. to Dismiss or, in the Alternative, Mot. for Summ. J., Dkt. #30-1, ¶ 8 ("Taylor Decl.")). Plaintiffs provide no explanation of what they mean by "risk-adjusted value," except that plaintiff Taylor as much as admits that it is simply another way of saying that there is a risk of future loss to his deposits. See Taylor Decl. ¶ 8 (indicating that it is the risk of loss "[s]tated differently"). Plaintiff Eric Taylor also admits that the nominal amount of deposits he has on paper remains the same, id., and plaintiffs do not allege that they would not be able to withdraw the full nominal amount of their deposits if they went into their banks today. Without more than this conclusory assertion, it is difficult to discern any distinction between plaintiffs' "risk-adjusted value" theory of injury and the theory of injury based on risk of future loss.

Supreme Court's recent statements in <u>Clapper</u> calling into question a standard for injury based on risk that is not certainly impending, 133 S. Ct. at 1150 & n.5, it is not clear whether a risk of future economic harm of the type alleged here is cognizable as injury.[2] Even assuming <u>arguendo</u> that increased risk to plaintiffs' bank deposits could qualify as injury, the risk alleged by plaintiffs is too speculative to confer standing.

The risk alleged by plaintiffs requires the type of "highly attenuated chain of possibilities" contingent upon "guesswork" as to the actions of third parties that <u>Clapper</u> held could not bestow standing. 133 S. Ct. at 1148-50 & n.5. In order for the hypothesized injury to occur, (1) banking entities that are not parties to this action (including Plaintiffs' Banks) would have to engage in speculative proprietary trading activities despite the statutory prohibitions in the Volcker Rule; (2) such trading activities would have to result in losses to Plaintiffs' Banks

---

[2]Plaintiffs cite to <u>Baur v. Veneman</u>, 352 F.3d 625 (2d Cir. 2003), for the proposition that the Second Circuit recognizes increased risk as a basis for standing. Pls. Opp'n 13. However, in <u>Baur</u>, the Second Circuit determined that enhanced risk could qualify as sufficient injury in the context of environmental and food and drug safety cases but explicitly stated that it was not deciding whether enhanced risk generally would qualify. <u>Id.</u> at 634; <u>see also</u> <u>Natural Res. Def. Council</u>, 710 F.3d at 80-81 (interpreting <u>Baur</u> as applying in the specific context of food and drug safety suits). The other cases that plaintiffs cite from this circuit also dealt with the risk of environmental harm or food and drug safety. <u>See</u> <u>N.Y. Pub. Interest Research Grp. v. Whitman</u>, 321 F.3d 316 (2d Cir. 2003) (issuance of air pollution permits); <u>LaFleur v. Whitman</u>, 300 F.3d 256 (2d Cir. 2002) (same). In holding that heightened risk of unlawful arrest did not confer standing, Judge Glasser of this district has previously summarized the <u>Baur</u> line of cases:

> In the end, the "heightened risk" doctrine has only been applied in a narrow range of cases: those in which an agency's failure to conform to a statutory mandate has resulted in the plaintiff's exposure to a greater risk of an either difficult to remedy injury that the statute explicitly sought to prevent, <u>and then, only in the context of exposure to environmental conditions or harmful products</u>.

<u>Nat'l Council of La Raza v. Gonzales</u>, 468 F. Supp. 2d 429, 440 (E.D.N.Y. 2007) (emphasis added).

such that they would not be able to return to plaintiffs the full nominal amounts of their deposits; and (3) the losses to Plaintiffs' Banks, and to national FDIC-insured banks generally, would have to be so large-scale that the FDIC would not be able cover the full amount of plaintiffs' deposits even after tapping the full extent of the FDIC's funding sources. Plaintiffs fail to allege facts that would raise this chain of events above mere speculation to a "credible threat." See Baur, 352 F.3d at 633, 636-37.

While admitting that "some banks have pared down their proprietary trading activities," plaintiffs insist that "such activities nevertheless persist." Am. Compl. ¶ 16. However, plaintiffs make no allegations that such activities persist at their own banks, JP Morgan Chase Bank and Wells Fargo Bank. The only specific instance of proprietary trading activities referred to by plaintiffs (the so-called "London Whale" incident) reportedly occurred in JP Morgan Chase Bank's London office in April 2012, prior to the effective date of the statutory Volcker Rule on July 21, 2012. See id. ¶ 19; Pls. Opp'n 16 (citing Taylor Decl. ¶ 8; U.S. Permanent Subcommittee on Investigation, Committee on Homeland Security and Governmental Affairs, JPMorgan Chase Whale Trades: A Case History of Derivatives Risks and Abuses (Mar. 15, 2013)). Plaintiffs speculate that "[a] properly implemented Volcker Rule would have prohibited JP Morgan from engaging in these speculative bets." Am. Compl. ¶ 20. However, plaintiffs do not allege that they were injured by the London Whale incident, and such speculative allegations are not probative of whether proprietary trading activities persist at Plaintiffs' Banks or elsewhere as of the time of this suit.

Plaintiffs also cite to the FSOC Study as "highly probative of plaintiffs' standing" because the study recognizes the risk posed by proprietary trading. See Pls. Opp'n 15 (citing

FSOC Study 52). While government studies showing risk can weigh in favor of standing, see

Baur 352 F.3d at 637, the cited study is not helpful here. As plaintiff notes, the study indicates

that the Volcker Rule implements changes that reduce risk from proprietary trading, but the

study does not allege that banks continue to engage in risky proprietary trading or that the delay

in finalizing the regulations presents such a risk.

What is more, plaintiffs have not shown any likelihood that the full amount of their

deposits would not be covered by the FDIC insurance fund. Plaintiffs admit that Plaintiffs'

Banks are FDIC insured depository institutions, and that the FDIC is required by statute "to

insure the deposits of all insured depository institutions up to the standard maximum deposit

insurance amount," which is currently $250,000 per account. Defs. Facts ¶¶ 2-4 (internal

quotation marks omitted) (citing 12 U.S.C. § 1821(a)(1)(A), (a)(1)(E) and (B)(i) (2012 Supp.));

see also Am. Compl. ¶¶ 5-6. Plaintiffs suggest that there is a risk that their deposits will not be

protected in the event of a catastrophic loss because the FDIC's deposit insurance fund contains

only a small fraction of the reserves required to cover all insured deposits.[3] Pls. Opp'n 15-16

(citing FDIC, Update of Project Deposit Insurance Fund Losses, Income and Reserve Ratios for

the Restoration Plan (Mar. 28, 2013),

http://www.fdic.gov/deposit/insurance/memo_2013_03_28.pdf ("FDIC Update")).

Notwithstanding that assertion, plaintiffs do not refute that, beyond its reserve fund, the FDIC

has borrowing capacity from the U.S. Treasury that would cover a significantly greater portion

---

[3]Plaintiffs also attempt to allege that their funds are at risk by relying on the conclusory
assertion of plaintiff Eric Taylor that "[a]s recently as August 2009, the FDIC insurance fund
teetered on the precipice of insolvency." Pls. Opp'n 16 (citing Taylor Decl. ¶ 9). Even had
plaintiffs alleged facts to support this statement, its relevance to establishing the state of the
FDIC fund at the time of this suit in 2013 is doubtful.

of its insured deposits, nor do they deny that the health of the FDIC reserve fund has been improving significantly.[4]  See Defs. Reply 4 & n4.  While it is theoretically possible that banking losses so catastrophic and widespread as to deplete the FDIC's available funds could occur, plaintiffs have not shown that such possibility is "imminent" or more than an exercise in conjecture.

Plaintiffs attempt to lend immediacy to their alleged injury by arguing that it is in fact the current dwindling of the Conformance Period that is the "very basis" for their harm.  Pls. Opp'n 10.  Plaintiffs claim that they are "currently (and actually) being harmed by the Agencies' ongoing depletion of the Conformance Period" because "[w]ithout a Final Rulemaking, banks cannot begin to comply with the Volcker Rule in good-faith."  Id. at 11.  The problem with this argument is that it still does not show a current concrete harm to plaintiffs; it is simply an effort to transform an alleged risk of future harm into a present injury.  The dwindling of the Conformance Period does not itself cause injury to plaintiffs.  Plaintiffs' real argument is that the dwindling of the Conformance Period contributes to their risk of possible future injury, and, as the court has addressed above, such injury is highly speculative.

In sum, plaintiffs' allegations of injury would require the court to engage in a speculative

_____

[4]According to plaintiffs, the FDIC insurance fund has only $33 billion in reserves held against $7,333 billion in covered deposits—"a mere .0045 coverage ratio".  Pls. Opp'n 15 (citing FDIC Update).  However, as defendants note (and plaintiffs do not refute), the FDIC has borrowing authority of up to $100 billion with the Treasury.  Defs. Facts 4 & n.4 (citing 12 U.S.C. § 1824(a)).  (Defendants mistakenly assert that FDIC has the possibility to borrow up to $500 billion, but this temporary provision expired at the end of 2010.  See 12 U.S.C. § 1824(a)(3)).  In fact, the source cited by plaintiffs indicates that the deposit insurance fund balance had increased over the previous twelve consecutive quarters and demonstrates optimism that "the best estimate is that the [Deposit Insurance Fund] balance remains on track to meet the requirements of the Restoration Plan and Dodd-Frank."  FDIC Update at 1, 5.

chain of reasoning to arrive at a threat to plaintiffs' bank deposits that is neither certainly

impending nor for which there is even a substantial risk that could confer Article III standing.

　　　　ii.　　*Causation and Redressability*

　　　　Even were this court to find that plaintiffs have alleged injury in fact, which it does not,

plaintiffs have not established that such injury is "fairly . . .trace[able] to" defendants' failure to

finalize regulations for the Volcker Rule rather than the result of intervening independent action

of banks during the Conformance Period.　Lujan, 504 U.S. at 560 (alteration in original) (internal

quotation marks omitted).　Where, as here, (1) plaintiffs challenge governmental agencies on the

basis of third party conduct (in this case, on the basis of the alleged risky proprietary trading

activities of Plaintiffs' Banks) and (2) the government regulates the third parties (Plaintiffs'

Banks) rather than plaintiffs directly, it is "substantially more difficult" to meet the causation

requirement of standing.　Warth, 422 U.S. at 505; see also Allen v. Wright, 468 U.S. 737, 756-57

(1984) (no standing to sue Treasury officer where plaintiffs alleged that tax exemptions provided

to schools with discriminatory policies diminished plaintiffs' ability to have their children

educated in integrated schools); Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41-45 (1976)

(no standing to sue Treasury officer where plaintiffs alleged that IRS ruling allowing favorable

tax treatment to nonprofit hospital offering only emergency room services to indigents resulted

in denial of services to plaintiffs); Lane v. Holder, 703 F.3d 668, 673-74 (4th Cir. 2012) (no

standing where prospective handgun purchaser not directly regulated); Nat'l Wrestling Coaches

Ass'n v. Dep't of Educ., 366 F.3d 930, 938-44 (D.C. Cir. 2004) (no standing where plaintiffs

could not show that, in absence of Title IX enforcement policy, schools would continue men's

wrestling programs); Bloomberg L.P. v. Commodity Futures Trading Comm'n, Civ. A. No. 13-

523(BAH), 2013 WL 2458283, at *19, *23-26 (D.D.C. June 7, 2013) (no standing to sue CFTC where plaintiffs alleged that CFTC regulation treating two types of financial instruments differently might cause regulated parties to engage in behavior injurious to plaintiff). Plaintiffs here have not established that any ongoing proprietary trading by Plaintiffs' Banks is an inevitable result of the lack of final regulations. Plaintiffs themselves admit that many banks have halted their proprietary trading activities in anticipation of the Volcker Rule's implementation, Am. Compl. ¶ 16, thus suggesting that whether banks continue to engage in such activities currently is in fact an independent choice of those banks.

Most importantly, plaintiffs have not shown that any risky proprietary trading by their banks results from a lack of final regulations rather than the existence of the Conformance Period. Banks have until the end of the Conformance Period, which will be at the earliest July 21, 2014, to bring their conduct into compliance with the Volcker Rule. Until the expiration of the Conformance Period, banks are not required to be in full, final compliance with the Volcker Rule's provisions, whether statutory or regulatory. Thus, during the Conformance Period, the extent to which banks cease proprietary trading and come into compliance with the Volcker Rule is a their discretion, regardless of whether plaintiffs consider it advisable for banks completely to conform their conduct prior to the end of the Conformance Period. Because banks will not be required to comply with Volcker Rule regulations until July 21, 2014, the existence of final regulations before that date—which is a significant distance into the future—is not determinative of whether banks will engage in the prohibited activities prior to that date.

Because plaintiffs have not shown that, prior to the expiration of the Conformance Period, finalized regulations would result in any changes to banks' alleged proprietary trading

activities, they have not established causation or redressability sufficient for the purposes of standing.[5]

      c.     <u>Plaintiffs fail to establish standing as activist members of OSEC</u>

Plaintiffs also argue that they have standing as activist members of OSEC, which they describe as "an advocacy organization and subgroup of Occupy Wall Street that is dedicated to financial reform." Pls. Opp'n 9. According to plaintiffs, they suffer "the risk of irreparable injury" because the delay in finalizing Volcker Rule regulations "prevents [them] from engaging in their advocacy efforts relating to the real-world implementation of the Rule." Am. Compl. ¶ 29. Plaintiffs' arguments for standing on this front are equally unavailing because they again have not shown that they personally have suffered an injury in fact.

      I.     *Frustration of advocacy efforts*

Plaintiffs allege that they are injured by the frustration of OSEC's activist mission. Pls. Opp'n 18-21. According to plaintiffs, "[a]s OSEC members, [they] intend to ensure that banks comply with the dictates of the Volcker Rule," but have been frustrated in that purpose because, in the absence of a final rule, they are deprived of the "opportunity to monitor banks' compliance

---

    [5]It is also worth noting that, if plaintiffs are concerned about proprietary trading activities at their current banks, they have alleged nothing that would prevent them from withdrawing their deposits and taking their money to other banks. As self-titled activists for financial reform, plaintiffs would likely be aware of which banks have better records when it comes to speculative trading activities. The plaintiffs' decisions whether to deposit their money in a bank at all and with which bank to enter into a commercial relationship are personal choices. Self-inflicted injury that results from a plaintiff's personal choices rather than a defendant's conduct will not confer standing. <u>See</u> <u>McConnell v. FEC</u>, 540 U.S. 93, 228 (2003) (overruled on other grounds by <u>Citizens United v. FEC</u>, 558 U.S. 310 (2010)); <u>cf.</u> <u>Natural Res. Def. Council, Inc.</u>, 710 F.3d at 84-85. This court need not determine whether the alleged risk to plaintiffs' deposits is " so completely due to the plaintiff's own fault as to break the causal chain" alleged to connect that risk to defendant's conduct since causation is found lacking on other grounds. <u>Natural Res. Def. Council, Inc.</u>, 710 F.3d at 85 (quoting <u>Pierre v. Dyer</u>, 208 F.3d 394, 403 (2d Cir. 2000)).

with the final version of the Volcker Rule, advocate for improvements to such compliance, object to instances of non-compliance, and advocate for revisions to the Volcker Rule in view of its real-world implementation." Pls. Opp'n 18. In their argument for activist standing, plaintiffs rely on the decision of the U.S. District Court for the Southern District of New York in Fair Housing Justice Center, Inc. v. Silver Beach Gardens Corp. for the proposition that an advocacy organization suffers injury in fact when its mission is frustrated by a defendant's conduct. See Pls. Opp'n 19-20 (citing No. 10 Civ. 912(RPP), 2010 WL 3341907 (S.D.N.Y. Aug. 13, 2010)).

From the outset, it is doubtful whether individual plaintiff members, as opposed to the organization itself, would enjoy standing to sue on the grounds of "frustration of mission" purportedly recognized in Fair Housing Justice Center. In that case, as well as the Supreme Court precedent on which it relied, a plaintiff fair housing organization sought standing to sue in its own right where it was driven to divert its resources toward identifying and combating discriminatory practices by the defendants that were anathema to the organization's mission. Fair Hous. Justice Ctr., No. 10 Civ. 912(RPP), 2010 WL 3341907, at *6-7; see also Havens Realty Corp. v. Coleman, 455 U.S. 363, 378-79 (1982). Here, even if OSEC has suffered injury to its mission and resources analogous to that suffered by the fair housing organizations in Fair Housing Justice Center and Havens, OSEC is not a party to this action. Plaintiffs apparently concede that the alleged injury is really to OSEC as an organization. See Pls. Opp'n 19, 21 ("This actual damage to OSEC's advocacy efforts has already begun . . . . OSEC's standing inured on that day alone."). Plaintiffs state that they are members of OSEC and then rely on their recital of OSEC's advocacy activities to support their claim for standing, see Am. Compl.

¶¶ 5-6, 21, 30; Pls. Opp'n 18-21,[6] but they fail to show how mere membership in OSEC allows them to stand in the organization's shoes for purposes of constitutional standing to sue. Although plaintiffs' arguments refer indiscriminately to the advocacy efforts of OSEC the organization and of plaintiffs as individuals as if they are of one identity, see Pls. Opp'n 18-20, the plaintiffs have failed to show why a theory for organizational standing should apply to them as individuals.

Even assuming arguendo that the individual plaintiffs could enjoy standing based on injury to OSEC's advocacy efforts, plaintiffs have failed to adduce facts suggesting that such an injury has occurred. Foremost, plaintiffs' own account of OSEC's "ongoing advocacy efforts," Pls. Opp'n 18, belies their claim that the lack of final regulations prevents their Volcker-related advocacy efforts. Plaintiffs' real complaint appears to be not that they cannot engage in Volcker-related advocacy at all but that they cannot do so in precisely the way they want (*i.e.*, in the "manner and degree" they desire). Pls. Opp'n 21. The Supreme Court has been unwilling to confer standing on the basis of a "mere interest in a problem," see Sierra Club v. Morton, 405 U.S. 727, 739 (1976) (internal quotation marks omitted), and the holdings in Havens and Fair Housing Justice Center do not dictate that the plaintiff OSEC members could establish standing without showing actual injury beyond allegations that governmental action merely runs contrary

---

[6]Plaintiff Eric Taylor has stated that he was either "directly involved in" or "actively participated in preparation for" each of the enumerated "Volcker-related activism activities" undertaken by OSEC. Taylor Decl. ¶ 4. Plaintiffs have admitted that plaintiff Kristine Ekman did not sign the comment letter submitted by OSEC in response to the proposed rulemaking, Defs. Facts ¶18, and have not indicated any other specific advocacy activities in which Ekman participated.

to their advocacy interests.[7]    In both of those cases, the plaintiff organizations alleged harms beyond interference with their ability to advocate on an issue of interest.  See Havens, 455 U.S. at 379 (alleging diversion of resources to counteract unlawful practices and impairment of ability to provide counseling and referral services); Fair Hous. Justice Ctr., 2010 WL 3341907, at *7 (alleging diversion of resources to investigating and responding to discriminatory conduct).  In Havens, the Supreme Court granted standing because the plaintiff alleged a "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources" that "constitute[d] far more than simply a setback to the organization's abstract social interests."  455 U.S. at 379.

Cases interpreting Havens from the District of Columbia Circuit are instructive. Recently, the Court of Appeals for that circuit stated that, although it remains an open question whether injury to advocacy efforts alone supports standing under Havens, that court has denied standing based on frustration of advocacy where the challenged conduct and the plaintiff's stated mission were not in direct conflict.   Am. Soc'y for the Prevention of Cruelty to Animals v. Feld Entm't Co., 659 F.3d 13, 24-27 (D.C. Cir. 2011); see also Ctr. for Law & Educ. v. Dep't of Educ., 396 F.3d 1152, 1161-62 (D.C. Cir. 2005) (no standing where governmental action forced plaintiffs to change their lobbying strategies to more costly form of lobbying); Nat'l Treasury

---

[7]Plaintiffs cite United States v. Vasquez, 145 F.3d 74 (2d Cir. 1998), to argue that the Second Circuit will grant standing where a plaintiff is caused to "refrain from engaging in certain advocacy efforts 'when she would have liked to do so.'"  Pls. Opp'n 21 (citing 145 F.3d at 81).  As defendants have pointed out (Defs. Reply 9), plaintiffs misrepresent the holding in Vasquez, which addressed a plaintiff's First Amendment challenge to a lawsuit seeking to enjoin her protest activities.  Were the plaintiffs alleging that, as in Vasquez, the government had attempted to directly enjoin them from engaging in advocacy efforts, this would be a decidedly different case.

Emps. Union v. U.S., 101 F.3d 1423, 1428-30 (D.C. Cir. 1996) (effect on organization's lobbying efforts absent direct conflict with organizational mission insufficient to establish standing; allegation that "defendant's conduct has made the organization's <u>activities</u> more difficult" not enough).  Here, while the absence of finalized regulations may require plaintiffs to engage in Volcker Rule related advocacy different from what they otherwise would, there is no indication that the defendants' delay in finalizing the regulation directly conflicts with OSEC's mission to "advocate[] for regulatory reforms in the banking and financial system," Am. Compl. ¶ 5, or "seek[] to safeguard the banking system for the benefit of the public at large," Taylor Decl. ¶4.  The delay merely shifts the type and timetable of OSEC's advocacy.

Plaintiffs also appear to allege that the delay has frustrated OSEC's advocacy efforts because, as time passes, "the Occupy movement" has "lost momentum and public visibility" and will find it harder to garner public support for enforcing strict bank compliance with the Volcker Rule.  <u>See</u> Pls. Opp'n 20.  Assuming for purposes of a motion to dismiss that such assertions as to public opinion are true, such a loss of public attention for OSEC's advocacy interests cannot be said to rise to the level of something "more than simply a setback to the organization's abstract social interests" cognizable as injury.  <u>Havens</u>, 455 U.S. at 379.  Even were it sufficient to support a finding of injury, plaintiffs have offered no facts that would support the causal connection asserted by plaintiffs between defendants' delay in finalizing the regulations and lack of public support for, or attention to, OSEC's interests.  Plaintiffs assert: "The longer the Defendants delay in finalizing the Rule, the greater the difficulty that Plaintiff's face in corralling public support for strict bank compliance with the Volcker Rule."  Pls. Opp'n 20; <u>see also</u> Taylor Decl. ¶ 5.  Yet, plaintiffs present nothing to suggest that any "increased difficulty in

corralling public support" is a result of the delay in the final rule rather than a natural consequence of the passage of time and the dwindling of memories of the 2008-2009 financial crisis.

Under the circumstances here, plaintiffs have not shown that their alleged injury—an inability to advocate as members of OSEC in the precise manner they desire—is sufficient for purposes of Article III standing. "[A] mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem" is not enough. Sierra Club, 405 U.S. at 739.

ii.    *Informational Standing*

Plaintiffs also appear to argue that they have suffered injury in their role as activist members of OSEC because, without finalized regulations, they cannot access information that they would otherwise be able to use to monitor bank compliance. See Pls. Opp'n 21 & n.4. For this argument, plaintiffs rely on FEC v. Akins in which the Supreme Court found that a group of voters suffered injury sufficient for standing purposes where they alleged that they were unable to obtain information that a political group was statutorily required to disclose to the public. 524 U.S. 11, 20-21 (1998). Judge Korman of this district previously explained, "to the extent that the concept of informational standing has received any recognition, it . . . has been limited to very specific statutory contexts where a statutory provision has explicitly created a right to information." Tummino v. Hamburg, 260 F.R.D. 27, 31-32 (E.D.N.Y. 2009) (internal quotation marks omitted) (no standing where, because of regulatory determination, FDA not required to publicly provide information that plaintiffs desired for their advocacy efforts); see also Am. Soc'y for Prevention of Cruelty to Animals, 659 F.3d at 23 ("[P]laintiff must espouse a view of

the law under which the defendant (or an entity it regulates) is obligated to disclose certain information that plaintiff has a right to obtain.").

Here, plaintiffs have not shown what specific information they lack access to or how they have a statutory right to such information. Plaintiffs cite 12 U.S.C. § 1851(e)(1), which requires the agencies to issue regulations "regarding internal controls and recordkeeping" in order to insure compliance with the Volcker Rule. Pls. Opp'n 21 n.4. Plaintiffs assert that they "can utilize these records" to monitor banks' compliance, id., but fail to explain how they would construe the language of the statute as conferring a public right to information. They make no effort to explain the leap from "internal controls and recordkeeping" in the language of the statute to the required public disclosure they request. Furthermore, plaintiffs' own argument that they will not know what information will be made available by banks until the final regulations define the records that must be kept belies the fact that plaintiffs cannot show a current right to specific information. Id. ("[T]he Volcker statute does not delineate exactly what records must be kept.").

In sum, plaintiffs' alleged injury—that they desire to access unspecified information to monitor bank compliance—is insufficient to confer standing. While the court recognizes that plaintiffs raise serious issues of public concern regarding the behavior and monitoring of national banks, a federal court cannot act as a forum for addressing such concerns relating to the functions of the other branches of government in the absence of a constitutionally mandated "case" or "controversy."

**CONCLUSION**

For the foregoing reasons, plaintiffs have failed to establish that they have Article III standing to pursue their claims either as individuals or as activist members of OSEC. This failure precludes the court from exercising jurisdiction over their suit. Defendants' motion to dismiss for lack of jurisdiction is granted. The Clerk of Court is directed to enter judgment accordingly and close the case.

/s/_____
Allyne R. Ross
United States District Judge

Dated: September 9, 2013
        Brooklyn, New York